F#2006R00612
KTC:TH

**M-06- 348**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ZEINAB TALEB-JEDI,
    also known as
    "Zeinab Aghazadeh-Naini,"
    and "Zeinab Kasrai-Azar,"

        Defendant.

- - - - - - - - - - - - - - - - - - -X

AFFIDAVIT IN SUPPORT
OF ARREST WARRANT
(Title 18, United States
Code, Section 2339B)

      MARK BROIHIER, being duly sworn, deposes and says, that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), being appointed according to law and acting as such.

      Upon information and belief, in or about and between August 1999 and March 2006, both dates being approximate and inclusive, the defendant ZEINAB TALEB-JEDI, also known as "Zeinab Aghazadeh-Naini" and "Zeinab Kasrai-Azar," within the United States and subject to the jurisdiction of the United States, did knowingly and willfully provide material support and resources to a foreign terrorist organization, to wit, the Mujahedin-e Khalq ("MEK").

      (Title 18, United States Code, Sections 2339B and 3551 et seq.)

The source of my information and the grounds for my belief are as follows:

A.  **INTRODUCTION**

1.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), assigned to the Los Angeles division. I have been so employed for over 10 years. During this time I have received specialized training in terrorism-related investigations. I have conducted numerous investigations related to individuals associated with terrorist organizations and their associated criminal activity. For 6 years I have been assigned to the Los Angeles Task Force on Terrorism and the Joint Terrorism Task Force ("JTTF") and tasked to work with other federal and local law enforcement agencies to investigate international terrorism-related issues and individuals. As part of my duties for the last 5 years I have investigated an international terrorist organization known as the Mujahedin-e Khalq ("MEK").

2.  I make this affidavit based upon my personal knowledge and experience, my review of pertinent documentation, discussions with other investigating law enforcement officers, and interviews with the witnesses indicated therein, and in particular:

    a.  Oral and written reports about this investigation which either I authored or I received from law enforcement officers;

    b. The interviews of the witnesses indicated herein;

    c. My review and examination of documents and physical evidence obtained from witnesses interviewed, or through the methods described herein; and

    d. My discussions with other law enforcement agents.

   3. I have not attempted to include in this affidavit all of the evidence collected during this investigation. Rather, I have included only such evidence as I believe sufficient to establish probable cause for the arrest warrant requested.

**B. PURPOSE OF THE AFFIDAVIT**

   4. This affidavit is made in support of a criminal complaint and arrest warrant for: ZEINAB TALEB-JEDI, also known as "Zeinab Aghazadeh-Naini" and "Zeinab Kasrai-Azar" (hereinafter referred to as "TALEB-JEDI") for violation of Title 18, United States Code, Section 2339B (providing material support or resources to a designated foreign terrorist organization). The evidence provided in this affidavit is submitted to establish probable cause that TALEB-JEDI knowingly provided material support and resources to an organization known as the Mujahedin-e Khalq ("MEK"), a designated foreign terrorist organization, in the form of "personnel", that is, knowingly providing her labor and services to the MEK.

**C. STATUTORY BACKGROUND**

   5. In 1996, Congress passed the Antiterrorism and

4

Effective Death Penalty Act of 1996 ("AEDPA"). Two provisions of AEDPA, section 302 and section 303, codified at Title 8, United States Code, Section 1189 and Title 18, United States Code, Section 2339B, authorize the Secretary of State to designate an organization as a "foreign terrorist organization," and make it a crime for a person to provide "material support or resources" to a designated organization.

6. Title 8, United States Code, Section 1189 authorizes the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, to designate an organization as a "foreign terrorist organization" if the Secretary finds that the organization is a foreign organization that engages in terrorist activity (as defined in section 1182(a)(3)(B) of Title 8) and that the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States.

7. Title 18, United States Code, Section 2339B(a)(1) provides, in part:

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. . . .

8. The phrase "material support or resources" is defined at Title 18, United States Code, Section 2339A(b) as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities,

5

> financial services, lodging, training, expert advice or assistance, safe-houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

9. Regarding the provision of material support in the form of "personnel," Title 18, United States Code, Section 2339B(h) provides:

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization.

10. Title 18, United States Code, Section 2339B(d) specifically provides that there is extraterritorial Federal jurisdiction of an offense under this section. Title 18, United States Code, Section 3238, provides, in pertinent part, that venue shall be "in the district in which the offender . . . is first brought."

### D. THE DESIGNATED FOREIGN TERRORIST ORGANIZATION: MUJAHEDIN-E KHALQ ("MEK")

11. Throughout this affidavit the following abbreviations are utilized:

    a. Mujahedin-e Khalq, also known as the People's Mujahedin Organization of Iran, Mujahedin-e Khalq Organization, Sazman Mujahedin-e Khalq, Mujahedin-e Khalq Organization, Sazeman

Mujahedin-e Khalq, and Mojahedine-e Khalq, will collectively be referred to as ("MEK").

b. The National Liberation Army of Iran will be referred to as ("NLA").

c. The National Council of Resistance, also known as the National Council of Resistance of Iran, and the National Council of Resistance in Iran, will collectively be referred to as ("NCR").

12. Based on my knowledge and experience in investigating terrorist organizations, as well as my review of United States Department of State ("State Department") materials regarding the designation of certain groups as foreign terrorist organizations, I am aware of the following:

a. The MEK was originally designated by the State Department as a foreign terrorist organization on or about October 8, 1997. The MEK is a foreign terrorist organization which advocates the violent overthrow of the current Government of Iran.

b. On or about October 8, 1999, the NCR was added to the MEK's designation as a foreign terrorist organization by the State Department. The NCR was added by the State Department as an alias for the MEK.

c. The MEK and its aliases, including the NLA and NCR, were re-designated as a foreign terrorist organization in October 1999, October 2001, and October 2003. The designation

of the MEK as a foreign terrorist organization remains current as of the date of this affidavit.

13. I am aware from the State Department's annual report entitled <u>Patterns of Global Terrorism</u> and from FBI investigations that the MEK was founded in Iran in the 1960's. At the time the organization was founded, the goal was to overthrow the monarchist rule of the Shah of Iran, Mohammad Reza Pahlavi. In pursuit of this goal, the MEK publicly claimed responsibility for acts of terrorism against United States citizens and United States interests and other acts of terrorism against foreign sovereign nations.

14. Based upon my review of documentation obtained through multiple investigations, through informant interviews, I am aware that the organization is comprised of at least three primary branches:

a. The National Liberation Army ("NLA"), which is the military and operational branch of the MEK. The NLA is headquartered in Iraq. While Saddam Hussein ruled Iraq, the MEK conducted a substantial part of its terrorist training and launched a significant portion of its terrorist operations from NLA-operated military bases in Iraq, including a base that is called "the Ashraf Base."

b. The MEK has a support network that operates in the United States and other foreign countries. This support network is organized into cells that are led by a MEK leadership cadre. This support network is responsible for, among other

8

things, raising money to fund the MEK's activities, including the NLA bases in Iraq and the MEK's terrorist operations.

    c. The MEK has a political branch that is referred to as the National Council of Resistance of Iran ("NCR").

    15. In 2003, Operation Iraqi Freedom began and United States and other Coalition Forces invaded Iraq. In March and April 2003, positions controlled by the MEK were attacked by United States and Coalition Forces. These attacks forced the MEK into a cease-fire with the United States on or about April 15, 2003. Upon this cease-fire the United States implemented the following procedures:

    a. All MEK personnel in Iraq were ordered to cease all hostilities with Coalition Forces.

    b. All MEK personnel were ordered to assemble at Ashraf Base, located 65 kilometers Northwest of Baghdad and at the MEK base known as "Anzali," located near the town of Jalulah.

    c. All MEK personnel were ordered to turn in their heavy arms, to include T-72 tanks, T-55 tanks, Chieftain tanks, armored personnel carriers, anti-aircraft weapons, heavy mortars, and artillery. Initially, MEK personnel were allowed to keep their small arms.

    d. Subsequently, MEK personnel were ordered to turn in their small arms to include Kalishnakov assault rifles, BKC or PKS heavy machine guns, rocket-propelled grenades ("RPGs"), hand guns, and light mortars.

16. The United States Army set up a perimeter around Ashraf Base and established a security force near Ashraf. Within Ashraf Base, the United States Army set up a Logistics Support Area to support rotating military police units that were used for security of the perimeter of Ashraf Base.

17. In or about February 2004, a group of FBI agents, and agents from other United States law enforcement agencies, traveled to Iraq to interview the MEK personnel at Ashraf Base. During the course of the interview project, approximately 200 individuals associated with the MEK were interviewed.

18. At Ashraf Base, agents observed and documented firearms training ranges, physical training areas, gun emplacements (minus the weapons, due to their confiscation by United States Forces), barracks, bomb shelters, and shrines to MEK "martyrs." The Ashraf Base included approximately one hundred bunkers, which contained weapons, including rocket-propelled grenade launchers ("RPGs"), fully automatic heavy machine guns, mortars, rockets, missile launchers, tank ammunition, mortar ammunition, RPG ammunition, assault rifles, small arms ammunition, explosives and grenades. In one of these bunkers was stored over 420,000 pounds of plastic explosives. According to the interviews of MEK personnel, these weapons belonged to the MEK. In addition, agents traveled to Taji, Iraq, where all of the MEK heavy equipment was stored under the terms of the cease-fire agreement. At that location, agents observed numerous MEK tanks, armored personnel carriers, artillery, anti-

10

aircraft artillery, and recoil-less rifles, which appeared to be fully functional. All of the equipment was well marked with MEK insignias and Iranian flags. Specifically, the emblem for the MEK's NLA was clearly marked in white beneath the Iranian flag.

19. During the course of the interview project, approximately 200 individuals associated with the MEK were interviewed. Included in the interview project were the interviews of the defendant TALEB-JEDI.

### E. **THE DEFENDANT'S MATERIAL SUPPORT TO THE MEK**

Background of the Defendant

20. According to the immigration file (#27 031 032) of TALEB-JEDI that is maintained by the Department of Homeland Security, Bureau of Immigration and Customs Enforcement (the "A-file"), TALEB-JEDI was born in Iran on June 27, 1955. She left Iran and entered the United States on a student visa in 1978 and attended various universities in Atlanta, Georgia. In approximately 1983, the defendant moved to Queens, New York. In March 1986, the defendant moved to northern Virginia. She was granted lawful permanent residency status in October 1987. The defendant was naturalized as a United States citizen on August 26, 1996.

Information from Confidential Informants

21. During the course of this investigation, agents interviewed a confidential informant ("CI1"). CI1 was a member of or associated with the MEK for approximately 25 years. CI1

was part of the MEK's National Liberation Army, participated in MEK terrorist operations in Iran and was involved in MEK training activities in Iraq and MEK fund raising activities. CI1 has provided information to the FBI about MEK leadership, structure, organization and operations and activities in the United States, Iraq, Iran and elsewhere. CI1's information has been corroborated through interviews of other witnesses, including people knowledgeable about the MEK, and other investigative methods. CI1 recognized a photograph of the defendant TALEB-JEDI and described her as a leader of the MEK and a member of the MEK's "Shohra Rahbari," or leadership council. CI1 stated that Shohra Rahbari members were responsible for making leadership decisions for the organization, including approving specific acts of terrorism carried out by the MEK. CI1 stated that he/she has seen the defendant TALEB-JEDI at MEK bases in Iraq.

22. During the course of this investigation, agents interviewed another confidential informant ("CI2"). CI2 was a member of the MEK for approximately 17 years and was a member of the MEK's National Liberation Army ("NLA"). CI2 received MEK military training at MEK bases in Iraq and participated in MEK activities in Iraq near the Iranian border. CI2 has provided information to the FBI regarding MEK NLA training, military structure, organization, and operations. CI2's information has been corroborated through interviews of other witnesses, including people knowledgeable about the MEK, and other investigative methods. CI2 recognized a photograph of the

defendant TALEB-JEDI and, while he/she did not know her name, CI2 described her as a member of the "Shohra-e Rahbari," the MEK's military leadership council. CI2 stated that this council is responsible for making decisions regarding MEK activity and actions in Iraq. CI2 distinguished this council from the National Council of Resistance "Shorah-e Mali-E Moghavemat," which CI2 described as a political body that engages in lobbying and political activity. CI2 also stated that in the photograph shown, defendant TALEB-JEDI was wearing the uniform of a basic MEK soldier. CI2 stated that during the initial screening of MEK persons at Camp Ashraf, MEK leaders dressed in a basic uniform and told United States military personnel that they held lower ranking positions. CI2 stated that this was done to deceive the United States as to who was actually in charge of the MEK. CI2 stated that he/she began seeing defendant TALEB-JEDI at Ashraf Base in Iraq in approximately 1998 or 1999. CI2 stated that he/she observed the defendant TALEB-JEDI at MEK meetings in Iraq seated with other high-ranking MEK members.

Statements of the Defendant

23.   TALEB-JEDI was interviewed at Ashraf Base on or about March 2, 2004 and March 15, 2004. TALEB-JEDI was advised of her rights prior to the interview and she agreed to waive her rights and be interviewed. TALEB-JEDI was fluent in the English language and the Farsi language and agreed to be interviewed in English. She was made aware that she could speak in the Farsi

language or hear a Farsi-language translation should she need it, as an FBI Farsi translator was also present for the interview.

24. TALEB-JEDI stated that she is a United States citizen, was born in Iran, and began her college education in Iran. In 1978, she went to the United States to work on her Master's degree. In the United States, TALEB-JEDI began to be interested in Iranian politics. TALEB-JEDI eventually started going to demonstrations and protests in support of the MEK which she referred to as the People's Mujahedin of Iran ("PMOI"). She later moved to New York City and continued her MEK activities there. Meanwhile, her husband joined the MEK's National Liberation Army "NLA") and went to Ashraf Base in Iraq in 1986. TALEB-JEDI acknowledged that she had registered, pursuant to the Foreign Agents Registration Act, as a press officer for the PMOI in Washington, D.C. between December 1995 and February 1996.

25. TALEB-JEDI further stated that as early as 1999 she was aware that the United States government had designated the MEK as a foreign terrorist organization. Several months after she learned about the designation of the MEK as a foreign terrorist organization, in June of 1999, TALEB-JEDI received news that her husband had been killed in a bombing that killed a number of MEK members in Iraq. She then left her job, sold all her belongings, and traveled first to Jordan and then to the MEK Ashraf Base in Iraq. The defendant's U.S. passport indicates that she traveled to Jordan in 1999.

26. TALEB-JEDI stated that she did not want to return to the United States but wanted to remain at Ashraf Base because she "wholeheartedly supports the Mujahedin."

The Defendant's Impending Arrival in the United States

27. On March 31, 2006, TALEB-JEDI boarded Royal Jordanian Airlines Flight #261 in Amman, Jordan bound for John F. Kennedy International Airport in Jamaica, Queens ("JFK"), which is scheduled to arrive at JFK at 4:00 p.m. I am informed by an Assistant United States Attorney that jurisdiction and venue for prosecution of the case lies in the district where the defendant is "arrested" or is "first brought," pursuant to 18 U.S.C. § 3238.

**CONCLUSION**

28. Based on the facts set forth herein, and based on my training, education, experience, and participation in this investigation, as well as my discussions with the other agents working on this matter, I believe that there is probable cause to conclude that the defendant ZEINAB TALEB-JEDI, also known as "Zeinab Aghazadeh-Naini" and "Zeinab Kasrai-Azar," has violated Title 18, United States Code, Section 2339B, in that she provided material support or resources to a designated foreign terrorist organization, in the form of "personnel," in that she knowingly provided her labor and services to a designated foreign terrorist organization.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued so that the defendant ZEINAB TALEB-JEDI,

also known as "Zeinab Aghazadeh-Naini" and "Zeinab Kasrai-Azar," be dealt with according to law, and that this Affidavit and the arrest warrant be sealed, except that disclosure may be made, as necessary, for purposes of executing the arrest of the defendant.

*[signature]*
MARK BROIHIER
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
31st day of March, 2006

JMA

THE HONORABLE JOAN ........
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK